The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing parties have shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the deputy commissioner, with some minor technical modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate award.
Accordingly, the undersigned find as fact and conclude as matters of law the following, which were entered into by the parties in the I.C. Form 21, Agreement for Compensation, which was approved by the Commission on May 26, 1993, and in their Pre-Trial Agreement which was filed on May 13, 1996, and which are incorporated herein by reference, and at the initial hearing as
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case. The parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. The defendant was a duly qualified self-insured, with Alexsis, Inc., as the servicing agent.
3. The employee-employer relationship existed between the parties at all relevant times.
4. On or about October 14, 1992, the plaintiff contracted an admittedly compensable occupational disease, as a result of which the parties entered into the Form 21 Agreement.
5. The plaintiff's average weekly wage was $244.80, which yields a compensation rate of $163.20 per week.
6. The issues for determination are:
 a. Whether the plaintiff is entitled to receive benefits as a result of the admittedly compensable occupational disease;
 b. Whether vocational rehabilitation efforts should be continued; and
 c. Whether the plaintiff's fibromyalgia is causally related to the admittedly compensable occupational disease.
7. The plaintiff has been out of work from May 4, 1993, to at least the date of the initial hearing.
 ***********
Based upon all of the competent, credible, and convincing evidence adduced from the record, and the reasonable inferences therefrom, the undersigned make the following additional
 FINDINGS OF FACT
1. At the time of the admittedly compensable occupational disease, the plaintiff was a twenty-nine year old eighth grade educated female, who is right hand dominant. She has a limited ability to read and write.
2. On October 19, 1992, the plaintiff had been employed by the defendant for approximately seven months as a jitterbug sander operator. She used the hand-held sander with her right hand to sand chair legs and tops, during which the sander vibrated strongly.
3. The plaintiff began to experience right wrist symptoms on or about October 14, 1992, following which she reported her symptoms to her supervisor. She was sent to Dr. Eric Hart, the company's referral physician, where she was treated for tendinitis. Dr. Hart placed the plaintiff on light duty work. The plaintiff continued to treat with Dr. Hart until November 5, 1992, when he referred her to orthopedist Dr. Grey Winfield.
4. The plaintiff was sent to physical therapy under Dr. Winfield.
5. On January 18, 1993, the plaintiff was referred to board certified orthopedist Dr. Mark McGinnis, who subsequently performed a right radial tunnel release at the elbow and a right carpal tunnel release on the wrist on May 4, 1993. Post-operatively, the plaintiff continued to experience pain and numbness in the right hand. The plaintiff also complained of left arm problems.
6. The defendant terminated the plaintiff's employment relationship on July 16, 1993, despite the fact that she had not been released to return to work by Dr. McGinnis.
7. On September 24, 1993, Dr. McGinnis performed an ulnar nerve decompression and medial epicondylectomy on the right arm. Following surgery, the plaintiff continued to experience numbness and pain, including new symptoms in the lateral aspect of the wrist.
8. On January 5, 1994, Dr. McGinnis found the plaintiff had normal sensation in her right hand, but had decreased sensation in the left thumb, index, long, and small fingers. On May 4, 1994, Dr. McGinnis performed an ulnar nerve decompression on the left elbow.
9. On September 26, 1995, Dr. McGinnis saw the plaintiff for the last time. She continued to complain of diffuse pain in both arms, and was replacing worn-out elbow pads. Dr. McGinnis opined that the plaintiff was giving submaximal effort on strength testing, and he referred plaintiff to rheumatologist Dr. Dennis Payne.
10. Dr. McGinnis rated the plaintiff as retaining a fifteen percent permanent partial impairment of the right arm and a ten percent permanent partial impairment of the left arm after reaching maximum medical improvement on September 20, 1994.
11. Dr. McGinnis opined that the use of a jitterbug sander increases one's risk of getting tendinitis or peripheral nerve compression problems such as carpal or cubital tunnel syndrome.
12. On November 3, 1993, the plaintiff was seen by Dr. Dennis Payne for an evaluation for suspected fibromyalgia. On December 20, 1994, Dr. Payne found the plaintiff had reached maximum medical improvement and was totally disabled due to the pain of fibromyalgia. Dr. Payne does not recommend further treatment, other than medication for the fibromyalgia.
13. There is no convincing evidence in the record to causally relate plaintiff's fibromyalgia to the admittedly compensable disease.
14. There is no convincing evidence in the record to establish that plaintiff's left arm symptoms were causally related to her employment with the defendant. However, assuming, arguendo, that such medical evidence had been presented, the plaintiff never reported any left arm symptoms to her employer.
15. The plaintiff participated in a Rehabilitation Program at the workplace in Hickory, North Carolina, beginning on July 7, 1994, following which she was evaluated by staff with the N.C. Department of Human Resources Division of Vocational Rehabilitation Services. The evaluation placed the plaintiff in the first percentile for readers, displaying very minimal comprehension. Her math skills were found to be at a second grade level. On IQ test, the plaintiff was rated as having an overall 63, which placed her in the mildly mentally retarded range.
16. As a result of the vocational evaluation, the plaintiff was recommended to companion or inspection-type jobs.
17. On May 24, 1995, the defendant's vocational counselor, Roger Teal, accompanied the plaintiff to Griffith's Security, where she was interviewed by John Griffith for security guard work. Mr. Griffith had key round jobs and control/access jobs which would be appropriate to plaintiff's restrictions. However, at the interview, the plaintiff gave Mr. Griffith her medical records and restrictions, and offered excuses to why she would be unable to perform each type of work Mr. Griffith described. She also expressed concerns about working alone at night. As a result of plaintiff's conduct and words, Mr. Griffith concluded that she was not interested in taking a job with his company, even though he had hired a number of workers' compensation disabled persons in the past. Further, after Mr. Griffith was advised of plaintiff's IQ in his deposition, he opined that the security job would not be suitable to plaintiff's abilities.
 ***********
The foregoing stipulations and findings of fact engender the following
 CONCLUSIONS OF LAW
1. The plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease within the meaning of N.C.G.S. § 97-53(13). This requires the plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 101 (1981). In the instant case, the plaintiff has offered no credible or convincing evidence to establish that her left arm symptoms were causally related to her job, or that the fibromyalgia was causally related to the job.
2. As a result of the admittedly compensable injury to the right arm, as to which there is an approved Form 21 Agreement, the plaintiff is entitled to receive total disability compensation at the rate of $163.20 per week for the period from May 4, 1993 through the present and continuing until further orders of the Commission. N.C.G.S. § 97-29; Kisiah v. W.R. Kisiah Plumbing, Inc., 124 N.C. App. 72, 476 S.E.2d 434
(1996), disc. rev. denied 345 N.C. 343, 483 S.E.2d 169
(1997).
3. The plaintiff is entitled to have defendant provide vocational counseling to assist her in returning to gainful employment. N.C.G.S. § 97-25. The plaintiff shall cooperate fully with such vocational assistance.
4. The plaintiff is entitled to have the defendant pay for medical expenses incurred as a result of the admittedly compensable right extremity injury, as may be required to provide relief, effect a cure or lessen her period of disability. N.C.G.S. § 97-2(19).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
 AWARD
1. Plaintiff's claim for benefits due to the fibromyalgia or the left arm symptoms is, and must be, DENIED.
2. Subject to a reasonable attorney's fee herein approved, the defendant shall pay total disability compensation at the rate of $163.20 per week for the period from May 4, 1993, through the present and continuing until further orders of the Commission.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraph 2 above is HEREBY APPROVED to be deducted from sums due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be forwarded directly to plaintiff's counsel.
4. Defendant shall pay medical expenses incurred as a result of the right arm disease when bills for the same have been approved in accordance with the provisions of the Act. In addition, the defendant shall provide vocational rehabilitation services to the plaintiff, and the plaintiff shall cooperate with reasonable vocational rehabilitation efforts.
5. Defendant shall pay the costs, including the expert witness fee of $200.00 to Mark McGinnis, M.D. and $225.00 to Dennis Payne, M.D.
 ***********
IT IS FURTHER ORDERED that this case be REMOVED from the Full Commission hearing docket.
This the _____________day of October, 1998.
 S/ _____________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _____________ DIANNE C. SELLERS COMMISSIONER
S/ _____________ RENÉE C. RIGGSBEE COMMISSIONER
JHB:kws